UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KIRSTEN MEADE LENARTOWICH

                Case No. 14 Civ. _____

        Plaintiff,

   vs.                      **COMPLAINT**

INTERNATIONAL FIBER
CORPORATION, SPC MANAGEMENT
CO. INC. also known as SWANDER PACE
CAPITAL, ARSENAL CAPITAL
PARTNERS, DANIEL MUTH, individually,
JAMES GRAMKEE, individually, and ABC
CORPS. 1-10, fictitious names for persons or
entities whose present roles and identities are
unknown,

        Defendants.

_____

     Plaintiff, Kirsten Meade Lenartowich, by and through her attorneys, Meyers Fried-Grodin, LLP, as and for a Complaint, state as follows:

## STATEMENT OF THE CASE

    1.  This is an action, by an aggrieved individual against her former employer, alleging violations of federal and state law, for: (i) gender discrimination; (ii) sexual harassment; and (ii) retaliation for having engaged in legally protected activity which included objecting to gender discrimination (as against herself and others) and sexual harassment (as against herself).

## THE PARTIES

    2.  Plaintiff Kirsten Meade Lenartowich ("Plaintiff" or "Ms. Meade Lenartowich") is an individual who is a citizen of the United States and who resides in Niagara Falls, Ontario, Canada.

- 1 -

3.   Between in or about April 2006 and on or about July 11, 2013, Plaintiff was employed by International Fiber Corporation and SPC Management Co. Inc. also known as Swander Pace Capital ("SPC") (collectively, "IFC" or the "Company").

4.   Plaintiff worked as Human Resources Manager.

5.   Upon information and belief, International Fiber Corporation was and is a domestic business entity.

6.   Upon information and belief, International Fiber Corporation maintains a principal place of business at 50 Bridge Street, North Tonawanda, NY 14120, in Niagara County.

7.   Upon information and belief, SPC Management Co. Inc. also known as Swander Pace Capital was and is a domestic business entity.

8.   Upon information and belief, SPC Management Co. Inc. also known as Swander Pace Capital maintains a principal place of business at 550 Hills Drive, Suite 106, Bedminster, NJ 07921.

9.   Upon information and belief, Arsenal Capital Partners was and is a domestic business entity.

10. Upon information and belief, Arsenal Capital Partners maintains a principal place of business at 100 Park Avenue, 31st Floor, New York, NY 10017.

11. Upon information and belief, Defendant Daniel Muth ("C.E.O. Muth") was, at all relevant times, the Chief Executive Officer of International Fiber Corporation.

12. At all relevant times, C.E.O. Muth exercised close control over the managerial operations of IFC, including having hiring and firing authority, the authority to set or change compensation, and authority over virtually all aspects of the Company.

13. Upon information and belief, at all relevant times, C.E.O. Muth worked and resided in the State of New York, and in Erie County.  Upon information and belief, C.E.O. Muth currently resides in Manhattan Beach, California, in the County of Los Angeles.

14. Upon information and belief, Defendant James Gramkee ("C.F.O. Gramkee") was, at all relevant times, the Chief Financial Officer of International Fiber Corporation.

15. Upon information and belief, at all relevant times, C.F.O. Gramkee worked and resided in the State of New York, in Amherst, in Erie County.

## JURISDICTION AND VENUE

16. Jurisdiction is based on 28 U.S.C. § 1331, insofar as this action involves statutes of the United States, and specifically Title VII of the Civil Rights Act of 1964.

17. Additionally, Plaintiffs rely upon 28 U.S.C. § 1367 to invoke supplemental jurisdiction with respect to state law claims that form other bases for recovery upon the same factual nexus, specifically the New York Human Rights Law.

18. Venue is based on 28 U.S.C. § 1391(b)(2) insofar as a substantial part of the events giving rise to the within causes of action occurred in this Judicial District.

## FACTS COMMON TO ALL COUNTS

19. Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 18, above.

20. Plaintiff was hired by the IFC, in or about April 2006, as a Human Resources Manager, where she flourished -- until after she complained about gender discrimination (against herself and others) and sexual harassment (against herself).

**A.  Plaintiff Had a Remarkable Background and Superior Performance History**

21. Plaintiff came to IFC bearing exemplary qualifications, having: (i) received degrees from Sacred Heart University and SUNY Buffalo, and having studied at Cornell University's prestigious School of Industrial and Labor Relations; and (ii) already gained years of valuable industry experience at top institutions such as General Electric and Cadbury.

22. After being recruited to IFC in 2006 to work as a Human Resources Manager, Plaintiff displayed superior performance.  Indeed, in recognition of Plaintiff's performance, she received salary increases, was given increasing access to the Company's leadership team and eventually (in 2008) was promoted to Vice-President, Human Resources and Labor Relations.  In that capacity, Plaintiff became part of IFC's leadership team, and had the respect of top management.

23. Accordingly, it stands to reason that, in light of Plaintiff's credentials and accomplishments, Plaintiff was the kind of employee that IFC would seek to retain – barring an unlawful discriminatory or retaliatory motive.

24. Unfortunately, there is compelling evidence that an unlawful motive is behind Plaintiff's recent termination.  Namely – that after enduring sexual harassment and gender discrimination and complaining about it internally – the Company fired Plaintiff in retaliation.

**B.  Plaintiff Was Subjected to Gender Discrimination and then Experienced
    Retaliation After She Complained About It**

25. During Plaintiff's employment, she was one of only a few women who worked there, and she was the only female member of IFC's Executive Committee.

26. IFC has a male-dominated culture.  Indeed, Plaintiff was told, during the hiring process, that the Company does not hire women at its manufacturing facilities, and therefore, there had never been a female manager before her.

27. Also, upon information and belief, during Plaintiff's employment, there was only one other female manager besides her – although there were many male managers.

### (i)   *Complaints about Plaintiff's Compensation*

28. When Plaintiff was promoted to Vice-President, Human Resources and Labor Relations, Plaintiff reported directly to the Company's Chief Executive Officer and President, Daniel Muth.

29. Despite the position of responsibility that the Company put Plaintiff in, Plaintiff was the least-paid Executive Committee member who directly reported to the C.E.O/President.

30. Other male employees who were similarly-situated were paid more than Plaintiff.  At least one male employee made the same as Plaintiff, even though he was in a lesser position.

31. Additionally, male Executive Committee members received very substantial annual bonuses.  Plaintiff, however, received markedly smaller bonuses.

32. Moreover, in or about June 2012 Plaintiff raised this issue to C.E.O. Muth (because the bonus was substantially lower than C.E.O. Muth's other direct reports, and only about a quarter of what a retired, part-time male received).

33. It was also particularly surprising to Plaintiff because of the extremely hard work that Plaintiff had provided to the Company (which yielded great results) in connection with union-related lockout negotiations in 2011 (as well as for accomplishments in previous years).

34. In retaliation for Plaintiff's internal complaint, the already-comparatively-low bonus awarded to Plaintiff for 2012 was reduced from $11,500 to $7,500.   This news was communicated to Plaintiff by C.E.O. Muth via e-mail in or about early May, 2013.

35. Moreover, this bonus was supposed to be given to Plaintiff at a certain time.  However, it was not.  Instead, the Company withheld it for approximately seven weeks.

36. As a basis for reducing Plaintiff's bonus, C.E.O. Muth vaguely cited "performance issues." He could offer no specifics. (That is hardly surprising, because Plaintiff performed well).

37. Plaintiff challenged C.E.O. Muth on this, and pointed out that: (i) he had not cited any performance issues on Plaintiff's part in 2012; and (ii) there could certainly not be a single piece of paper documenting alleged poor performance on Plaintiff's part.

38. It was readily apparent that the only thing Plaintiff did wrong in 2012 was to not sleep with C.E.O. Muth – and Plaintiff informed C.E.O. Muth of this concern.

39. C.E.O. Muth's reaction to this was to send Plaintiff an e-mail that night indicating that he was shocked about what Plaintiff had said and he threatened to reduce Plaintiff's bonus to nothing.

### (ii)  Complaints about an Executive's Sexist Comments & Hiring Practices

40. Also, at various times Plaintiff complained to C.E.O. Muth about Vice-President of Operations, Peter Vogt's, (VP of Operations) inappropriate comments.

41. For example, Plaintiff complained about Vogt: (i) repeatedly calling Plaintiff the "HR Girl"; (ii) saying that Plaintiff should pull her skirt up higher to get people to apply for positions at the Company; (iii) saying that the only way to cure a headache is by a good "and it rhymes with truck"; (iv) during an Executive Committee meeting, learning over and asking Plaintiff (the only woman), what Plaintiff would be ordering the team for lunch; and (v) his adamantly telling Plaintiff -- every time that he spoke to Plaintiff about hiring a plant manager and supervisors – that he want to hire only "guys," and his negative reaction to Plaintiff telling him that we cannot exclude qualified females from the hiring process.

42. C.E.O. Muth did not appear to take Plaintiff's complaints about Mr. Vogt (or the Company's discriminatory hiring practices) seriously, and took no action in response to Plaintiff's complaints.

### C.    Plaintiff Was Subjected to Sexual Harassment and Experienced Retaliation After Plaintiff Complained About It

#### (i)    *C.E.O. Muth's Unusual Attention Towards Plaintiff*

43. During Plaintiff's employment she had a good working relationship, and was friendly with, C.E.O. Muth.  However, in late January 2012, he crossed the line and sexually harassed Plaintiff.

44. In 2011 and 2012 C.E.O. Muth began inviting Plaintiff to dinners that had an increasingly romantic and date-like feel to them.  He arranged for Plaintiff to be seated next to him at every Company event.  He paid Plaintiff excessive compliments.  He stood closer to Plaintiff than was appropriate.  He found excuses to touch Plaintiff.  He planned extravagant parties for Plaintiff. He blatantly arranged for Plaintiff to stay at his hotel (even though locals were told "no overnight stays").

#### (ii)    *C.E.O. Muth's Unwelcome Sexual Advances and Contact with Plaintiff*

45. Then on or around January 30 or 31, 2012 an especially upsetting incident happened involving C.E.O. Muth.

46. After a full day of working on site at a Senior Team Meeting and Board meeting, C.E.O. Muth had dinner with Plaintiff and the Senior Team, in a private room, at a restaurant called 800 Maple.

47. On the way there, C.E.O. Muth sent Plaintiff a text message, saying that he wanted Plaintiff to sit next to him and that he was saving a seat for Plaintiff.  He also commented on how

others would "talk."  Plaintiff did not think that there was anything for others to "talk" about, so Plaintiff stated that she did not care.

48. Throughout the dinner, C.E.O. Muth was extremely flirtatious with Plaintiff and he consumed a significant amount of alcohol.  At one point, Plaintiff felt his leg rubbing against hers, which she found unwelcome.

49. After dinner, a few people from the Company were staying at the Marriot hotel, so a group of them (including Plaintiff and C.E.O. Muth) went to the Marriot hotel bar.

50. At the hotel, C.E.O. Muth said that he would go get Plaintiff's hotel room key, as Plaintiff had not yet checked in.

51. Then, Plaintiff and C.E.O. Muth had a few drinks and Mr. Muth sat very close to Plaintiff.  Several times C.E.O. Muth placed Plaintiff's leg so that it would touch up against Plaintiff's leg.  Plaintiff found this to be unwelcome so Plaintiff tried to move her leg away. Nonetheless, C.E.O. Muth was persistent, and his leg continued to find its way over to Plaitniff's leg.

52. Ultimately, Plaintiff said she was ready to go up to bed and she reminded C.E.O. Muth that he had her room key, which she needed so that she could depart for the evening.

53. C.E.O. Muth said that he would go up with Plaintiff as he wanted to give Plaintiff some documents that he had in his room.

54. When they arrived at C.E.O. Muth's room he asked Plaintiff to come inside.

55. Once inside, Plaintiff sat on the couch and – although Plaintiff had not asked for one – C.E.O. Muth brought Plaintiff a glass of wine.

56. C.E.O. Muth sat on the couch next to Plaintiff, an appeared to be intoxicated.

57. Plaintiff asked C.E.O. Muth what documents had for Plaintiff, and the next thing Plaintiff knew, C.E.O. Muth had started to kiss Plaintiff.

58. Plaintiff put her hand up and pushed back.

59. Trying to be as polite as she could under the circumstances, Plaintiff told C.E.O. Muth that she did not think that this was a good idea, that they had a great working relationship, and that she did not have romantic feelings for him.

60. Somehow, either before C.E.O. Muth sat down, or while Plaintiff was talking, C.E.O. Muth had unzipped his pants.  He forcibly took Plaintiff;s hand and as he started to tell her that it was "OK," he moved Plaintiff's hand and forced it to touch his bare, erect penis.

61. Plaintiff immediately pulled her hand up and jumped away.

62. Plaintiff told C.E.O. Muth absolutely not.

63. C.E.O. Muth then began to laugh.

64. Plaintiff was disgusted and frightened by C.E.O. Muth's outrageous actions.

   (iii)    *Retaliation Against Plaintiff After She Rejected C.E.O. Muth's Sexual Advances*

65. Prior to the January 2012 incident, C.E.O. Muth had ensured that Plaintiff was involved in virtually every aspect of the Company's operations.  C.E.O. Muth sought Plaintiff's advice and opinions on a number of matters for which Plaintiff was responsible (and some for which Plaintiff was not).  C.E.O. Muth allowed Plaintiff a platform to speak at Executive Committee Meetings and his interactions with Plaintiff were generally friendly and courteous.  C.E.O. Muth also freely spoke with Plaintiff about challenges he faced at work and discussed his personal matters as well.

66. After the January 2012 incident, C.E.O. Muth's behavior towards Plaintiff became increasingly hostile.

67. He stopped communicating with Plaintiff on a daily and friendly basis.

68. He stopped including and involving Plaintiff in certain day to day operations.

69. He began excluding Plaintiff from certain Human Resources-related discussions with other executives in management.

70. He began removing responsibilities from Plaintiff.

71. He spearheaded and approved markedly reduced bonuses for Plaintiff for 2011 and 2012.

72. He began publicly humiliating Plaintiff by chastising her during meetings and in e-mails.

73. In several meetings he called Plaintiff a "cougar" in front of her male peers and he further demeaned Plaintiff in front of male peers.  ("Cougar" is a reference to an older woman who makes sexual advances on younger men).

74. He unfairly criticized Plaintiff's job performance at the very end of 2012 and threatened to issue Plaintiff an unwarranted poor evaluation for the year.

75. When Plaintiff complained that it appeared that his actions were in retaliation for the January 2012 incident, his treatment of Plaintiff worsened.

### (iv)    *After Plaintiff Complained About Discrimination and Harassment She Was Fired Because of Her Complaints*

#### a.   **Retaliation by IFC**

76. On June 27, 2013, Plaintiff's attorney sent a demand letter to IFC articulating claims of sexual harassment, *quid pro quo* treatment, disparate treatment-based gender discrimination, and retaliation, and asserting Plaintiff's legal rights.

77. The Company's immediate response, on July 8, 2013, was to have C.F.O. Gramkee, tell Plaintiff that she was being suspended because she had lodged a complaint of discrimination by way of her attorney sending the June 27, 2013 letter.

78. When Plaintiff informed C.F.O. Gramkee that the suspension constituted unlawful retaliation, and that Plaintiff planned to pursue her legal rights (by contacting her attorney to incorporate this retaliatory action into her legal matter and by filing a complaint with the EEOC), he just shrugged his shoulders.

79. Plaintiff was forced to surrender her keys and e-mail access, and was prominently "walked out" in an embarrassingly public way (in the manner of an employee who was being terminated).

80. Furthermore, the Company accessed Plaintiff's personal e-mail account during that time.

81. The Company's mistreatment caused Plaintiff to lodge an internal complaint, by way of an e-mail dated July 10, 2013.

82. Instead of conducting a meaningful investigation of Plaintiff's complaint, or engaging in any sort of dialogue whatsoever with her about her complaint, the Company's knee-jerk reaction was to fire Plaintiff the next day, July 11, 2013.

83. Incredibly, the Company's July 11, 2013 termination letter specifically references her internal complaint from the previous day.  (However, the Company's claim that its termination decision was not motivated by retaliation – just a day after Plaintiff's internal complaint – is completely incredible).

b.       **Retaliation by IFC's New Parent Company, Arsenal**

84. In 2013, Arsenal Capital Partners ("Arsenal") was poised to buy International Fiber Corporation.

85. Plaintiff had been promised a position, as Vice-President of Human Resources with Arsenal after the transaction in which Arsenal purchased International Fiber Corporation.

86. Soon after Plaintiff engaged in legally protected activity (by way of her attorney's June 27, 2013 demand letter, and by her own July 10, 2013 internal complaint), Plaintiff was told in writing, by Joelle Marquis of Arsenal, that the transaction was not going to take place, and that therefore no one at Arsenal would continue to talk to her. (This was remarkably inconsistent with the way that Arsenal had previously treated Plaintiff, by *e.g*., including Plaintiff on correspondence regarding post-transaction issues, thus indicating that the deal was moving forward and that she was going to soon work for Arsenal).

87. Further, Ms. Marquis – apparently aware that Plaintiff had engaged in legally protected activity regarding her employment-law-based allegations – further wrote to her that "We've been told by counsel to request that you refrain from further contact with anyone at Arsenal."

88. Marquis' representation that the transaction was no longer being discussed was evidently a fabrication aimed at discouraging Plaintiff from following-up with the promise of employment at Arsenal because Arsenal harbored retaliatory animus against Plaintiff for having asserted her legal rights.

89. Indeed, the falsity of Ms. Marquis' misrepresentation was proven by the fact that just a few weeks later, Arsenal publicly announced that the transaction in which it bought IFC.[1]

---

[1] *See* the announcement on Arsenal's website: http://www.arsenalcapital.com/news/2013-08-28-a/index.cfm

90. That notwithstanding, Plaintiff was never contacted about assuming the Vice-President of Human Resources at Arsenal.

91. It is only reasonable to conclude that IFC and Arsenal coordinated their retaliatory approach to dealing with Plaintiff.

**D. <u>Plaintiff Has Suffered, and Continues to Suffer Damages</u>**

92. Since being terminated, Plaintiff has been unable to find comparable re-employment.

93. It is Plaintiff's understanding that the Company has found others to perform the work that Plaintiff used to perform.

94. Additionally, Plaintiff has suffered severe emotional distress as a result of her experienced with the Defendants.

<u>COUNT ONE</u>
**(Disparate Treatment Gender Discrimination in Violation of Title VII – Defendants IFC & SPC)**

95. Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 94, above.

96. Prior to filing this Complaint, Plaintiff, on January 16, 2014, filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

97. On August 26, 2014, the EEOC issued a right to sue letter to Plaintiff.

98. Defendants caused Plaintiff to experience adverse employment actions, including lower compensation and bonuses, due to her gender.

99. Defendants' actions constitute violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 21 *et. seq.*)

100.     As a result of Defendants' unlawful actions, Plaintiff has suffered a loss of employment, and a loss of wages, benefits, advancements in seniority, and other emoluments of employment.

101.     In addition, Plaintiff has suffered emotional distress.

102.     Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiff's rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages.

## COUNT TWO
### (Gender Discrimination Under the NYSHRL – Defendants IFC & SPC)

103.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 102, above.

104.     Defendants caused Plaintiff to experience adverse employment actions, including lower compensation and bonuses, due to her gender.

105.     Defendants' actions constitute violations of the New York State Human Rights Law (Executive Law § 296).

106.     As a result of Defendants' unlawful actions, Plaintiff has suffered a loss of employment, and a loss of wages, benefits, advancements in seniority, and other emoluments of employment.

107.     In addition, Plaintiff has suffered emotional distress.

108.     Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiff's rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages.

## COUNT THREE
### (Sexual Harassment Under Title VII – Defendants IFC & SPC)

109.       Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 108, above.

110.       Prior to filing this Complaint, Plaintiff, on January 16, 2014, filed a Charge of Discrimination with the EEOC.

111.       On August 26, 2014, the EEOC issued a right to sue letter to Plaintiff.

112.       Plaintiff was, at all relevant times, an employee of IFC and SPC.

113.       IFC and SPC were, at all relevant times, Plaintiff's employer.

114.       Defendants discriminated against Plaintiff, on the basis of her gender, by subjecting her to a sexually hostile work environment.

115.       Defendants took tangible employment actions against Plaintiff, including terminating her, and permitting individuals (including the Company's C.E.O.) to sexually harass Plaintiff.

116.       Plaintiff endured sexual insults, questioning and harassment from individuals (including the Company's C.E.O.) that were unwelcome, severe, pervasive, regular, repeated, and continuous.

117.       This harassment detrimentally affected Plaintiff, and was sufficiently severe or pervasive as to alter the terms and conditions of her employment and create a hostile, abusive working environment.

118.       A reasonable person would have found the harassment and discrimination that Plaintiff experienced to be severe, pervasive, hostile and abusive, and Plaintiff herself subjectively found her work environment to be severe, pervasive, hostile and abusive.

119.     The ongoing harassment of Plaintiff because of her gender constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

120.     The ongoing harassment that Plaintiff experienced, because of her gender, constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

121.     The acts complained of herein also constitute a continuing violation because Defendants IFC and SPC had notice and knowledge of C.E.O. Muth's harassment of Plaintiff, but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice.

122.     Accordingly, Plaintiff's Complaint challenges all discriminatory conduct and harassment by C.E.O. Muth (and imputed to the Defendants IFC and SPC) as part of the violations complained of herein.

123.     Defendants IFC and SPC failed to exercise reasonable care to prevent and correct promptly the harassment including C.E.O. Muth's sexually harassing behavior.

124.     As a result of Defendants' conduct, Plaintiff has been harmed.

125.     The Defendants' was unlawful under Title VII and that conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiff's rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages.

### COUNT FOUR
### (Sexual Harassment Under NYSHRL – Defendants IFC & SPC)

126.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 125, above.

127.     Plaintiff was, at all relevant times, an employee of IFC and SPC.

128.     IFC and SPC were, at all relevant times, Plaintiff's employer.

129.     Defendants discriminated against Plaintiff, on the basis of her gender, by subjecting her to a sexually hostile work environment.

130.     Defendants took tangible employment actions against Plaintiff, including terminating her, and permitting individuals (including the Company's C.E.O.) to sexually harass Plaintiff.

131.     Plaintiff endured sexual insults, questioning and harassment from individuals (including the Company's C.E.O.) that were unwelcome, severe, pervasive, regular, repeated, and continuous.

132.     This harassment detrimentally affected Plaintiff, and was sufficiently severe or pervasive as to alter the terms and conditions of her employment and create a hostile, abusive working environment.

133.     A reasonable person would have found the harassment and discrimination that Plaintiff experienced to be severe, pervasive, hostile and abusive, and Plaintiff herself subjectively found her work environment to be severe, pervasive, hostile and abusive.

134.     The ongoing harassment of Plaintiff because of her gender constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

135.     The ongoing harassment that Plaintiff experienced, because of her gender, constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

136.     The acts complained of herein also constitute a continuing violation because Defendants IFC and SPC had notice and knowledge of C.E.O. Muth's harassment of Plaintiff,

but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice.

137.     Accordingly, Plaintiff's Complaint challenges all discriminatory conduct and harassment by C.E.O. Muth (and imputed to the Defendants IFC and SPC) as part of the violations complained of herein.

138.     Defendants IFC and SPC failed to exercise reasonable care to prevent and correct promptly the harassment including C.E.O. Muth's sexually harassing behavior.

139.     As a result of Defendants' conduct, Plaintiff has been harmed.

140.     The Defendants' conduct was unlawful under the NYSHRL and was egregious, willful, wanton and/or in reckless disregard of Plaintiff's rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages (or uncapped compensatory damages).

## COUNT FIVE
### (Retaliation under Title VII  -- Defendants IFC, SPC & Arsenal)

141.      Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 140, above.

142.     Defendants unlawfully retaliated against Plaintiff for having engaged in legally-protected activity within the meaning of Title VII.

143.     As a direct and proximate result of the aforesaid occurrence, Plaintiff sustained injuries.

144.     Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiff's rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages.

## COUNT SIX
### (Retaliation under NYSHRL -- Defendants IFC, SPC & Arsenal)

145.    Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 144, above.

146.    Defendants unlawfully retaliated against Plaintiffs for having engaged in legally-protected activity within the meaning of the NYSHRL.

147.    As a direct and proximate result of the aforesaid occurrence, Plaintiff sustained injuries.

148.    Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiff's rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages (or uncapped compensatory damages).

## COUNT SEVEN
### (Individual Liability Under Title VII)

149.    Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 148, above.

150.    At all relevant times, C.E.O. Muth and C.F.O. Gramkee had authority over Plaintiff's employment and the terms and conditions of her employent.

151.    In addition to their active roles in discriminating against and retaliating against Plaintiff, Defendants Muth and Gramkee, coerced and/or compelled discriminatory and retaliatory action be taken against Plaintiff.

152.    Additionally, Defendant Muth aided and abetted in the sexual harassment that Plaintiff experienced.

153.    As a result of Defendants' unlawful actions, Plaintiff has suffered a loss of employment, and a loss of wages, benefits, advancements in seniority, and other emoluments of employment.

154.    In addition, Plaintiff has suffered emotional distress.

155.    Defendant Muth's and Gramkee's unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiff's rights and warrant the imposition of punitive damages.

**COUNT EIGHT**
**(Individual Liability Under NYSHRL)**

156.    Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 155, above.

157.    At all relevant times, C.E.O. Muth and C.F.O. Gramkee had authority over Plaintiff's employment and the terms and conditions of her employent.

158.    In addition to their active roles in discriminating against and retaliating against Plaintiff, Defendants Muth and Gramkee, coerced and/or compelled discriminatory and retaliatory action be taken against Plaintiff.

159.    Additionally, Defendant Muth aided and abetted in the sexual harassment that Plaintiff experienced.

160.    As a result of Defendants' unlawful actions, Plaintiff has suffered a loss of employment, and a loss of wages, benefits, advancements in seniority, and other emoluments of employment.

161.    In addition, Plaintiff has suffered emotional distress.

162.     Defendant Muth's and Gramkee's unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiff's rights and warrant the imposition of punitive damages.

### COUNT NINE
### (Respondeat Superior)

163.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 162, above.

164.      IFC and Arsenal are liable for any and all damages incurred as a result of the actions and/or omissions of Defendants Muth and Gramkee and/or other individuals who engaged in unlawful conduct pursuant to the doctrine of *respondeat superior*.

### COUNT ELEVEN
### (Fictitious Party Allegations)

165.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 164, above.

166.     Defendants John Does 1-10 and ABC Corps 1-10 are fictitious individuals, corporations, partnerships, business entities, or anyone else who participated with the treatment, management, and supervision of Ms. Holleman at all relevant times; and/or those with an ownership interest in ACI and/or who possessed the requisite position such as to be individually liable for violations of Title VII and/or the NYSHRL.

167.     Defendants John Does 1-10 and ABC Corps 1-10 retaliated against Plaintiff in their collective and/or respective care supervision, management and/or treatment of her, were responsible for the harms inflicted upon her, and otherwise aided and abetted the discrimination, harassment and/or retaliation against Plaintiff; and/or share common ownership, affiliation, or enterprise with ACI such as to be liable for violations of Title VII and/or the NYSHRL.

168.    As a direct and proximate result of the carelessness, recklessness, intentional wrongfulness, negligence, and discriminatory animus of Defendants John Does 1-10 and ABC Corps 1-10, said names being fictitious, Ms. Holleman was caused to suffer damages.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by this Complaint, and any pleadings in this action.

## PRAYER

WHEREFORE, Plaintiffs demand judgment against the Defendant for the following:

a.    compensatory damages including back-pay, front-pay, and emotional distress in an amount no less than $10,000,000;

b.    attorneys' fees and costs;

c.    punitive damages; and

d.    such other and further relief as the Court finds just and proper.

Respectfully submitted,

**MEYERS FRIED-GRODIN LLP**
Attorneys for Plaintiff


By:_____

Dated: September 16, 2014          Jonathan Meyers, Esq.
                                   Empire State Building
                                   350 Fifth Avenue, 59th Floor
                                   New York, NY 10018
                                   (646) 596-1292
                                   JMeyers@MfgLegal.com

- 22 -

TO:


INTERNATIONAL FIBER CORPORATION
50 Bridge Street
North Tonawanda, NY
14120

SPC MANAGEMENT CO. INC. also known as SWANDER PACE CAPITAL
550 Hills Drive, Suite 106
Bedminster, NJ
07921

ARSENAL CAPITAL PARTNERS
100 Park Avenue
31st Floor
New York, NY
10017

DANIEL MUTH
3304 Maple Avenue
Manhattan Beach, CA
90266-3506


JAMES GRAMKEE
143 Ruskin Road
Buffalo, NY
14226-4264